ENS Med., P.C. v Nationwide Ins. Co. (2026 NY Slip Op 26033)

[*1]

ENS Med., P.C. v Nationwide Ins. Co.

2026 NY Slip Op 26033

Decided on February 13, 2026

Supreme Court, Kings County

Maslow, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on February 13, 2026
Supreme Court, Kings County

ENS Medical, P.C. a/a/o Various Assignees, Petitioner,

againstNationwide Ins. Co., Adrienne A. Harris as the Superintendent of 
 Department of Financial Services, Respondents.

Index No. 504169/2024

Gary Tsirelman, P.C., Brooklyn (Gary Tsirelman of counsel), for petitioner.Letitia James, Attorney General, New York City (Frances Polifione of counsel), for respondent Superintendent.Hollander Law Group, P.C., Melville (Brian E. Kaufman of counsel), for respondent Nationwide Prop. & Cas. Ins. Co. s/h/a Nationwide Ins. Co.

Aaron D. Maslow, J.

The following numbered papers bearing NYSCEF Document Numbers were used in this special proceeding:
Submitted by Petitioner:Doc No. 1: PetitionDoc No. 2: Affirmation of Gary TsirelmanDoc No. 3: Exh. 1 — Petitioner's submissionDoc No. 4: Exh. 2 — Respondent's submissionDoc No. 5: Exh. 3 — Arbitration awardDoc No. 6: Exh. 4 — Master arbitration awardDoc No. 7: Exh. 5 — Attorney fee affirmation of Gary TsirelmanDoc No. 8: Notice of petitionDoc No. 9: RJIDoc No. 10: Affirmation of service of David T. BugayevSubmitted by Respondent Adrienne A. Harris:Doc No. 11: Notice of cross-motion to dismissDoc No. 12: Memorandum of lawDoc No. 13: Proposed orderDoc No. 14: No-fee letterDoc No. 15: Affirmation of service of Frances PolifioneSubmitted by Respondent Nationwide Ins. Co.:Doc No. 16: Notice of cross-motion to dismissDoc No. 17: Cross-petition and affirmation in oppositionDoc No. 18: Exh. A — Affirmation of service of David T. Bugayev in other proceedingDoc No. 19: AnswerDoc No. 20: Submission at arbitrationSubmitted by Petitioner:Doc No. 25: Affirmation of Gary Tsirelman in reply in support of petition, in opposition to Respondent Nationwide Ins. Co.'s cross-motion to dismiss, and in support of petitioner's cross-motionDoc No. 27: Notice of cross-motion to Respondent Nationwide Ins. Co.'s cross-motion
Upon the foregoing papers, having heard oral argument, and due deliberation having been had, the within petition and motions are determined as hereinafter set forth.
I. IntroductionThe No-Fault Insurance system has bedeviled practitioners and judges for over 50 years. The Court of Appeals has described the complex statutory and regulatory scheme as a "Rube-Goldberg-like maze" (Contact Chiropractic, P.C. v New York City Tr. Auth., 31 NY3d 187, 195 [2018]; Presbyterian Hosp. in City of NY v Maryland Cas. Co., 90 NY2d 274, 286 [1997]; see Viviane Etienne Med. Care, P.C. v Country-Wide Ins. Co., 25 NY3d 498, 505 [2015]).
In this case, the Court is called upon to determine the arcane issue of whether health service providers summoned to attend examinations under oath (EUOs) as part of the process of seeking additional verification of No-Fault health service claims may use the No-Fault arbitration forum to challenge denials by insurance carriers of their requests for reimbursement of lost earnings resulting from their attendance. There is no reported case law answering the question. This Court answers the question in the affirmative but determines that Petitioner is not entitled to vacatur of the subject master arbitration award. Petitioner, however, is entitled to relief with respect to the applicable arbitration request form.

II. Background
In this CPLR Article 75 special proceeding, Petitioner ENS Medical P.C. petitions for vacatur of a No-Fault master arbitrator's award affirming a hearing arbitrator's [FN1]
award denying compensation for lost earnings incurred when attending an EUO scheduled by Respondent Nationwide Ins. Co. The EUO was scheduled as additional verification with respect to four claims for No-Fault insurance benefits. The hearing arbitrator, referring to statute, ruled that the No-Fault arbitration forum administered by the American Arbitration Association lacked subject matter jurisdiction. The petition also seeks an order commanding the Superintendent of Financial Services, in her role as the regulator of the No-Fault insurance system, to promulgate arbitration procedures with respect to claims for reimbursement of lost earnings when attending [*2]an EUO. The petition has been designated Motion Sequence No. 1.[FN2]

Respondent Superintendent of Financial Services cross-moves to deny the petition and dismiss the proceeding as against her.[FN3]
This motion has been designated Motion Sequence No. 2.
Contending that service of the papers commencing this special proceeding were improperly served, that no company named "Nationwide Ins. Co." exists, and that, in any event, the master arbitrator's award should be confirmed, Nationwide Property & Casualty Insurance Company (which the Court treats as the Respondent denoted as Nationwide Ins. Co.) cross-moves for denial and dismissal of the petition.[FN4]
 This motion has been designated Motion Sequence No. 3.
Finally, Petitioner cross-moves to extend its time to cure any defect in service and deem the petition timely and properly served nunc pro tunc, and for attorney's fees, costs, and disbursements. This motion has been designated Motion Sequence No. 4.
This matter came before the Court for oral argument on November 15, 2024.[FN5]

III. The Underlying Dispute
Petitioner ENS Medical, P.C., owned by Dr. Omar Ahmed, was the assignee of No-Fault insurance medical claims of four eligible injured persons arising from motor vehicle accidents: Martin Merced, allegedly injured on January 1, 2019; Jose Mohammed, allegedly injured on February 24, 2019; Mervyn Lewis, allegedly injured on March 3, 2019; and Frances Cruz, allegedly injured on January 1, 2019. After ENS Medical, P.C. submitted claim forms for payment of charges for medical services performed for the four assignors, Respondent Nationwide sought additional verification of the claims, as is permitted pursuant to the No-Fault Insurance Regulations. The nature of the additional verification sought was an EUO of ENS Medical, P.C. by its principal, Dr. Ahmed. Dr. Ahmed appeared for the EUO on June 13, 2019, and testified.
Thereafter, in December 2019, an invoice was sent on ENS Medical, P.C.'s behalf by its attorneys to Nationwide. The invoice sought $20,000 as reimbursement for Dr. Ahmed's appearance at the EUO. Nationwide responded to the invoice by seeking documentation to substantiate the $20,000 claim for lost earnings. It appears that none was provided.
ENS Medical, P.C. filed for arbitration before the American Arbitration Association [*3](AAA) of its claim for the $20,000 as compensation for lost earnings resulting from Dr. Ahmed's attendance at the June 13, 2019 EUO.[FN6]
The AAA assigned Case No. 17-20-1155-2146 to the arbitration. On February 16, 2022, Arbitrator Regina Anzalone Kurz dismissed the arbitration claim without prejudice, finding that the requested verification for the sum demanded remained outstanding.
On August 18, 2022, ENS Medical, P.C. again filed for arbitration before the AAA of its claim for the $20,000 as compensation for lost earnings resulting from Dr. Ahmed's attendance at the June 13, 2019 EUO. The AAA assigned Case No. 17-22-1262-9216 to the arbitration. The matter was assigned to Arbitrator Tali Philipson. On December 1, 2023, Arbitrator Philipson denied the claim in her award, holding that "the reimbursement of loss of earnings for a physician's time spent providing testimony at an EUO is not arbitrable before the American Arbitration Association" (NYSCEF Doc No. 5 at 3). Arbitrator Philipson quoted from Insurance Law § 5106 (b), which provides in pertinent part: "Every insurer shall provide a claimant with the option of submitting any dispute involving the insurer's liability to pay first party benefits, or additional first party benefits, the amount thereof or any other matter which may arise pursuant to subsection (a) of this section to arbitration pursuant to simplified procedures to be promulgated or approved by the superintendent."
Arbitrator Philipson then quoted from subsection [FN7]
(a) of § 5106, which provides in pertinent part: "Payments of first party benefits and additional first party benefits shall be made as the loss is incurred. Such benefits are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained. If proof is not supplied as to the entire claim, the amount which is supported by proof is overdue if not paid within thirty days after such proof is supplied."
After providing the statutory definition for first party benefits, which refers to the term "basic economic loss," Arbitrator Philipson concluded that "I agree with Respondent's position that neither the Insurance Law nor the No-Fault Regulations allows an insured, or their assignee, to arbitrate a claim for loss of earnings incurred in complying with a request to appear for an EUO. Reimbursement for testimony at an EUO is not 'basic economic loss' to the injured party and therefore by extension cannot be considered 'basic economic loss' to the injured party's assignee" (NYSCEF Doc No. 5 at 5). Basic economic loss, noted the arbitrator, was defined as necessary expenses incurred for medical, hospital, surgical, nursing, dental, ambulance, x-ray, prescription drug, and prosthetic services; other health services; loss of earnings for work which a person would have performed had he not been injured; and other reasonable and necessary expenses (limited to $25 per day). Moreover, there was no promulgated No-Fault claim form for the claim made by ENS Medical, P.C., and the promulgated Form NF-10 denial of claim lacked [*4]a category for post-EUO loss of earnings incurred by a health service provider. Neither was there space on the arbitration commencement form, Form AR-1, for post-EUO loss of earnings incurred by a health service provider.
Arbitrator Philipson concluded: "Accordingly, after careful consideration of the evidence and arguments presented by both parties, I find for the Respondent. This arbitration forum is intended to resolve disputes relating to No Fault claims for 'basic economic loss' which encompasses medical treatments and lost wages and interest on overdue claims for these two categories. The Applicant's claim for $20,000 for his loss of earnings due to his attendance at an EUO is not 'basic economic loss' as described above. Applicant's claim is denied for lack of jurisdiction." (Id.)
ENS Medical, P.C. filed for master arbitration and the AAA assigned Case No. 99-22-1262-9216 to the appeal. In his award dated January 24, 2024, Master Arbitrator Alfred J. Weiner affirmed Arbitrator Philipson, finding that "the determination of the no-fault arbitrator is not arbitrary, capricious or contrary to law" (NYSCEF Doc No. 6 at 3).

 IV. Discussion(A) Adoption of the No-Fault Insurance System
In the 1960s, New York was faced with a crisis whereby motor vehicle accident victims waited an extraordinarily long time to be compensated for their economic loss (health service expenses and lost earnings) and non-economic loss (pain and suffering), as it took years for litigation to wind its way through the courts — and compensation could be obtained only if the defendant was found to be the tortfeasor.
After years of proposed solutions, New York adopted a no-fault system whereby persons injured in motor vehicles would be compensated for their economic loss without regard to fault. At the same time, in order to balance out the obvious increase in economic loss payouts by insurers, a means was needed to limit financial compensation for non-economic loss, meaning pain and suffering. The scale needed to be balanced so that an insurance-based compensation system could still exist and premiums could remain affordable for consumers. To accomplish this, damages for pain and suffering had to be limited. The legislation enacted as Chapter 13 of the Laws of 1973 ("Comprehensive Automobile Insurance Reparations Act") attempted to do this by requiring that motor vehicle accident victims be compensated for pain and suffering only if they were found to have sustained a "serious injury," as defined in a few categories;[FN8]
the [*5]legislation took effect in 1974.[FN9]
These categories did not prove workable, so the Legislature enacted a new set of definitions for serious injury in Chapter 892 of the Laws of 1977. With the addition of loss of a fetus in chapter 143 of the Laws of 1984, there are now nine definitions of "serious injury," i.e., nine categories.[FN10]
(See generally John R. Dunne, New York's No-Fault Automobile Insurance Law—A Glimpse of the Past and a Glance at the Future, 50 NY St BJ 284 [June 1978]; David Herbert Schwartz, No-Fault Insurance: Litigation of Threshold Questions under the New York Statute—The Neglected Procedural Dimension, 41 Brook L Rev 37 [Summer 1974]; David Aronson et ano., No-Fault Insurance in New York: Another Hazard for the Innocent Driver [Winter 1974]; James N. Benedict, New York Adopts No-Fault: A Summary and Analysis, 37 Albany L Rev 662 [1973].)
This system which New York maintains, known as the "No-Fault Law,"[FN11]
is a trade-off. It balances the public interest in maintaining a viable system for treating accident victims so they can recover as best as possible while weeding out claims for pain and suffering which do not rise to what is described as "serious injury." No doubt everyone injured in an accident with resulting pain deems their condition serious. Notwithstanding that, the public policy of this State, as codified in statutory law, is that those who cannot establish "serious injury" as a matter of law are relegated to not being compensated for pain and suffering (non-economic loss). While this may not console those whose lawsuits seeking compensation for pain and suffering resulting from the negligence of others in the course of operating a motor vehicle are dismissed for lack of serious injury — either through summary judgment or at trial — it is important to point out that payment for health service expenses and lost earnings regardless of fault is complementary to the [*6]requirement that compensable pain and suffering be limited to a higher gradation of injuries.
With the foregoing discourse, this Court has sought to explain the intent behind the No-Fault system. The first instance of doing so by the highest level of the judiciary was when the constitutionality of the No-Fault system was sustained in Montgomery v Daniels (38 NY2d 41, 49-53 [1975] [footnotes omitted]):
Before turning to an analysis of the constitutional claims advanced, it will be helpful to review some of the studies and proceedings which preceded enactment of article 18.Debate over the efficacy of the tort system of compensating automobile accident victims has raged for over 40 years. Our Legislature in 1973 thus had available to it a staggering number of reports and studies which provided analysis of the concept of a no-fault system of reparations and to which our attention is now drawn by both plaintiffs and defendants on this appeal. These studies identify at least four basic infirmities or defects in the common-law fault system of automobile accident reparation for personal injuries. For the purposes of this appeal, we recognize these four infirmities or defects as predicates for the Legislature's enactment of article 18.The first infirmity was the acknowledged fact that exposure to the risk of tort liability did not function as a significant factor in motivating drivers to operate their vehicles carefully or prudently. (DOT Report, at pp 53-57; Insurance Department Report, at pp 12-13; Keeton and O'Connell, at pp 247-249.) Nothing in the new no-fault act seeks to remedy this infirmity; indeed the new law apparently proceeds on the assumption that threat of economic disadvantage, by way either of increased insurance premiums or of excess recoveries, is no effective deterrent to bad driving.Secondly it was urged that the tort system was excessively and needlessly expensive and inefficient. Keeton and O'Connell (at p 70, n 190) and the DOT Report (at p 51) both concluded that half or perhaps less than half of the automobile liability insurance premium dollar was paid in actual compensation to accident victims. The Insurance Department Report stated (at p 35) that only 44 cents of the premium dollar reached the injured claimants.Thirdly it was urged that the distribution of compensation among accident victims under the tort system of reparation was unfair and inequitable for a number of reasons. The most revealing statistic reported was that one quarter of the persons who sustained bodily injury in auto accidents in New York received no compensation whatsoever (Insurance Department Report, at p 18). Where the tort system did provide recompense, the statistics further revealed that minor injuries were often overcompensated (at least in terms of readily ascertainable medical expenses) while those suffering serious injuries were being underpaid. Moreover it was concluded in all reports that the tort system was plagued by long delays in claim payment.As a fourth major inadequacy of the fault system of reparation, it was argued that the system placed an inordinate strain on the State's court systems and judicial resources. (See, generally, Insurance Department Report, at pp 19-24; DOT Report, at pp 70-79; and Keeton and O'Connell, at pp 13-15.)In March, 1970 the Governor sent the first proposed legislation for implementing no-fault concepts in this State to the Legislature accompanied by a special message (reprinted in 111th Annual Report of the Superintendent of Insurance to the Legislature for 1969 [1970], at pp 329-331). Public hearings were held on the proposed bill, but no action was [*7]taken that year. In 1971 the Governor followed a similar procedure (see 112th Annual Report of the Superintendent of Insurance to the Legislature for 1970 [1971], at pp 155-157) and more hearings were held, but again no action was taken on any of the at least five bills before the Legislature. In 1972 even more extensive hearings were held at which some 90 witnesses testified including the Governor, Superintendent of Insurance and Federal Insurance Administrator, but again no legislative action was taken. In 1973, however, the act which is here under scrutiny was passed and signed into law as chapter 13. This synopsis of article 18's legislative history is presented to demonstrate that the Legislature acted only after unusually extensive study and investigation and on what must be accepted for purposes of judicial review as an uncommonly sturdy legislative basis.It is additionally worth noting that prior to February 1, 1974, the effective date of article 18, 13 other jurisdictions had enacted various forms of no-fault insurance laws. In those jurisdictions where the courts of last resort have passed on the constitutionality of the no-fault plans enacted by their respective Legislatures, all but one have sustained the legislation.It remains here only to add that we recognize that other studies and data can be cited which tend to refute the conclusions on which our Legislature predicated its enactment of article 18. The judiciary, however, is not called on to weigh the relative worth of data or arguments which may be marshaled on either side as to the wisdom of determinations made by the Legislature in the realm of policy. "Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance." (Chicago, Burlington & Quincy R. R. Co. v McGuire, 219 US 549, 569; see, also, infra., pp 54- 55, 56, 64.)In this instance, perhaps more than in most, in the light of the exhaustive and vigorous public discussion of no-fault insurance in this State and elsewhere and the extended legislative consideration which preceded adoption of article 18, it would be a demonstration of judicial arrogation and highly inept and inapt to express any opinion as to the factual predicate for this legislation, its philosophical justification or the ultimate wisdom of its enactment. It is not our office to rejoice or to lament. A fair regard for the basic polity of separation of powers dictates judicial respect for the proper role of the legislative branch, and pride in the uniquely and essentially neutral role of the judicial branch. That judicial role is both a privilege and a limitation.Other appellate decisions likewise have sought to provide background for the enactment of the No-Fault system:
In 1973 the Legislature enacted the "Comprehensive Automobile Insurance Reparations Act" (see L 1973, ch 13)—commonly known as the No-Fault Law—with the objective of promoting prompt resolution of injury claims, limiting cost to consumers and alleviating unnecessary burdens on the courts (see Governor's Mem Approving L 1973, ch 13, 1973 McKinney's Session Laws of NY, at 2335). Every car owner must carry automobile insurance, which will compensate injured parties for "basic economic loss" occasioned [*8]by the use or operation of that vehicle in New York State, irrespective of fault (Insurance Law §§ 5102[a], 5103). Only in the event of "serious injury" as defined in the statute, can a person initiate suit against the car owner or driver for damages caused by the accident (Insurance Law § 5104 [a]).No-Fault thus provides a compromise: prompt payment for basic economic loss to injured persons regardless of fault, in exchange for a limitation on litigation to cases involving serious injury (see Montgomery v Daniels, 38 NY2d 41, 50-51 [1975]). Abuse nonetheless abounds. From 1992 to 2000, reports of No-Fault fraud rose more than 1,700% and constituted 75% of all automobile fraud reports received by the Insurance Department in 2000 (see Matter of Medical Socy. of State of NY v Serio, 100 NY2d 854 [2003]; see also State Farm Mut. Auto. Ins. Co. v Mallela, 4 NY3d 313 [2005]). There is, similarly, abuse of the No-Fault Law in failing to separate "serious injury" cases, which may proceed in court, from the mountains of other auto accident claims, which may not. That "basic economic loss" has remained capped at $50,000 since 1973 provides incentive to litigate.In the context of soft-tissue injuries involving complaints of pain that may be difficult to observe or quantify, deciding what is a "serious injury" can be particularly vexing. Additionally, whether there has been a "significant" limitation of use of a body function or system (the threshold statutory subcategory into which soft-tissue injury claims commonly fall) can itself be a complex, fact-laden determination. Many courts have approached injuries of this sort with a well-deserved skepticism. Indeed, failure to grant summary judgment even where the evidence justifies dismissal, burdens court dockets and impedes the resolution of legitimate claims. As a hint of the dimension of the situation, in less than three years, Toure v Avis Rent A Car Sys. (98 NY2d 345 [2002])—addressing similar issues—already has been cited more than 500 times in published decisions of our trial and appellate courts (representing only a small portion of the trial court activity). (Pommells v Perez, 4 NY3d 566, 570-572 [2005].)Enactment of the Comprehensive Motor Vehicle Insurance Reparations Act (L 1973, ch 13 [eff Feb. 1, 1974]), served the dual purpose of assuring that accident victims received compensation for their economic loss and of restricting the cost of rising automobile insurance policy premiums (Zoldas v Louise Cab Corp., 108 AD2d 378, 380). However, limitations were placed on the right to sue, namely, that only those who suffered a serious injury were entitled to sue to recover their damages. In 1977, "serious injury" was redefined by the Legislature to counter the fact that so many individuals were able to meet the original statutory definition and the purpose of the legislation, i.e., reducing automobile accident litigation, was being subverted (L 1977, ch 892; see, mem of State Executive Dept, 1977 McKinney's Session Laws of NY, at 2450). (Sanpietro v McCoy, 130 AD2d 648, 649 [2d Dept 1987].)In 1973, the Legislature enacted the Comprehensive Motor Vehicle Automobile Insurance Reparations Act (see L 1973, ch 13), which supplanted common law tort actions for most victims of automobile accidents with a system of no-fault insurance. Under the no-fault system, payments of benefits 'shall be made as the loss is incurred' (Insurance Law § 5106[a]). The primary aims of this new system were to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial premium [*9]savings to New York motorists (see Governor's Mem approving L 1973, ch 13, 1973 McKinney's Session Laws of NY, at 2335). (Matter of Medical Socy. of State of NY v Serio, 100 NY2d 854, 860 [2003].)A legislative objective in enacting the No-Fault Law was to reduce significantly the burden of automobile personal injury litigation on the courts (Memorandum of State Executive Department, 1977 McKinney's Session Laws of NY, at 2445, 2448; Governor's Message of Approval of L. 1977, ch 892, id., at 2534, 2535). (Roggio v Nationwide Mut. Ins. Co., 66 NY2d 260, 264 [1985].)[T]he very purpose of the no-fault law was to ensure the " 'swift reimbursement of accident victims . . . who had serious injuries' " (Pavone v Aetna Cas. & Sur. Co., 91 Misc 2d 658, 663), with "as little litigation as possible" (Matter of Furstenberg [Aetna Cas. & Sur. Co.], 67 AD2d 580, 583, revd on other grounds 49 NY2d 757) (Presbyterian Hosp. in City of NY v Aetna Cas. & Sur. Co., 233 AD2d 431, 432 [2d Dept 1996]).

 (B) Basic Economic Loss and First Party Benefits
As discussed above, the No-Fault Law sets apart economic loss (generally health service expenses and lost earnings) and non-economic loss (pain and suffering).
The provision in the Comprehensive Automobile Insurance Reparations Act ("No-Fault Law") which mandates payment of "No-Fault" benefits for economic loss is set forth in Insurance Law § 5103 (a): "Every owner's policy of liability insurance issued on a motor vehicle in satisfaction of the requirements of article six or eight of the vehicle and traffic law shall also provide for; every owner who maintains another form of financial security on a motor vehicle in satisfaction of the requirements of such articles shall be liable for; and every owner of a motor vehicle required to be subject to the provisions of this article by subdivision two of section three hundred twenty-one of the vehicle and traffic law shall be liable for; the payment of first party benefits to: . . ." There then ensue categories of people entitled to the first party benefits, such as "[p]ersons, other than occupants of another motor vehicle or a motorcycle, for loss arising out of the use or operation in this state of such motor vehicle" (Insurance Law § 5103 [a] [1]).
To understand the No-Fault system of insurance benefits, before one reads the definition of first party benefits, one must be cognizant of the definition of basic economic loss. The two terms are not exactly one and the same. Basic economic loss is defined by the following subsets of loss, subject to a maximum of $50,000:[FN12]

(1) All necessary expenses incurred for: (i) medical, hospital (including services rendered in compliance with article forty-one of the public health law, whether or not such services are rendered directly by a hospital), surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services; (ii) psychiatric, physical therapy (provided that treatment is rendered pursuant to a referral) and occupational therapy and rehabilitation (provided that treatment is rendered pursuant to a referral); (iii) any non-medical remedial care and treatment rendered in accordance with a religious method of healing recognized by the laws of this state; and (iv) any other professional health [*10]services; all without limitation as to time, provided that within one year after the date of the accident causing the injury it is ascertainable that further expenses may be incurred as a result of the injury. For the purpose of determining basic economic loss, the expenses incurred under this paragraph shall be in accordance with the limitations of section five thousand one hundred eight of this article.(2) Loss of earnings from work which the person would have performed had he not been injured, and reasonable and necessary expenses incurred by such person in obtaining services in lieu of those that he would have performed for income, up to two thousand dollars per month for not more than three years from the date of the accident causing the injury. An employee who is entitled to receive monetary payments, pursuant to statute or contract with the employer, or who receives voluntary monetary benefits paid for by the employer, by reason of the employee's inability to work because of personal injury arising out of the use or operation of a motor vehicle, is not entitled to receive first party benefits for "loss of earnings from work" to the extent that such monetary payments or benefits from the employer do not result in the employee suffering a reduction in income or a reduction in the employee's level of future benefits arising from a subsequent illness or injury.(3) All other reasonable and necessary expenses incurred, up to twenty-five dollars per day for not more than one year from the date of the accident causing the injury. (Insurance Law § 5102 [a] [emphasis added].)In addition, basic economic loss includes "a death benefit in the amount of two thousand dollars for the death of such person arising out of the use or operation of such motor vehicle which is in addition to any first party benefits for basic economic loss" (id. § 5103 [a] [4]).A covered person is one who is entitled to first party benefits (see id. § 5102 [j]). First party benefits are the actual payments of benefits. First party benefits are defined as basic economic loss less certain specifically enumerated deductions:
(1) Twenty percent of lost earnings computed pursuant to paragraph two of subsection (a) of this section.(2) Amounts recovered or recoverable on account of such injury under state or federal laws providing social security disability benefits, or workers' compensation benefits, or disability benefits under article nine of the workers' compensation law, or medicare benefits, other than lifetime reserve days and provided further that the medicare benefits utilized herein do not result in a reduction of such person's medicare benefits for a subsequent illness or injury.(3) Amounts deductible under the applicable insurance policy. (Id. § 5102 [b].)

 (C) Regulations & Nature of Petitioner's Claim for Reimbursement
Petitioner ENS Medical, P.C. is not seeking payment of first party benefits in the nature of health service expenses. Neither is it seeking payment of first party benefits in the nature of loss of earnings from work. Rather, it is seeking reimbursement of lost earnings occasioned by its appearance at an EUO. ENS Medical, P.C. is not a person injured in a motor vehicle accident who is covered by No-Fault insurance, i.e., a covered person. Rather, ENS Medical, P.C. is an assignee of several covered persons.
In furtherance of the statutory scheme, a comprehensive set of No-Fault Regulations was [*11]promulgated by the Superintendent of Insurance (presently Superintendent of Financial Services). They are presently contained at 11 NYCRR Part 65. Said part is subdivided into five subparts which encompass the following topics: prescribed policy endorsements (11 NYCRR Subpart 65-1), rights and liabilities of self-insurers (11 NYCRR Subpart 65-2), claims for personal injury protection benefits [FN13]
(11 NYCRR Subpart 65-3), arbitration (11 NYCRR Subpart 65-4), and unauthorized providers of health services (11 NYCRR Subpart 65-5). Part 65 is also known as Insurance Regulation 68.
Generally, the claims process for health service bills for No-Fault insurance compensation begins with the submission by a health service provider of a claim form (usually, but not always, a Form NF-3 verification of treatment by attending physician or other provider of health services).[FN14]
The claim form includes a bill for services performed and provides information regarding the injured person, the accident, the subject insurance policy, the billing health service provider, diagnoses, and projected treatment. The claim form can be submitted directly by the injured person to the No-Fault insurer but over many decades a practice developed whereby the health service providers submit the claim forms. They possess standing to do so by virtue of having received signed assignments of benefits from the injured persons.[FN15]
,[FN16]
The insurer must then either pay or deny the bill within 30 days, or seek additional verification within 15 business days. If it denies payment, it must issue a Form NF-10 denial of claim [FN17]
explaining why the bill was not paid. (See Insurance Law § 5106 [a]; Viviane Etienne Med. Care, P.C. v Country-Wide Ins. Co., 25 NY3d 498, 505 [2015].)
The 30-day deadline is statutory (see infra at 13-14). The additional verification process for establishing proof of claim is a creature of the No-Fault Regulations promulgated by the Superintendent of Financial Services. Attending an EUO, be it by a covered person or his or her assignee (health service provider), as a component of the additional verification process, is mandated by the prescribed No-Fault endorsement to a motor vehicle liability insurance policy set forth in the No-Fault Regulations at 11 NYCRR 65-1.1 (d) ("Conditions") and in the claim [*12]processing provisions of the Regulations at 11 NYCRR 65-3.5.
The Conditions portion of the prescribed No-Fault endorsement to a motor vehicle liability insurance policy, as promulgated in the Regulations, provides in pertinent part as follows:
Proof of Claim. Medical, Work Loss, and Other Necessary Expenses. In the case of a claim for health service expenses, the eligible injured person or that person's assignee or representative shall submit written proof of claim to the Company, including full particulars of the nature and extent of the injuries and treatment received and contemplated, as soon as reasonably practicable but, in no event later than 45 days after the date services are rendered. . . . Upon request by the Company, the eligible injured person or that person's assignee or representative shall:(a) execute a written proof of claim under oath;(b) as may reasonably be required submit to examinations under oath by any person named by the Company and subscribe the same; (11 NYCRR 65-1.1 [d] ["Conditions"].)The claim processing provisions in the Regulations include the following:
Section 65-3.5. Claim procedure. . .(b) Subsequent to the receipt of one or more of the completed verification forms, any additional verification required by the insurer to establish proof of claim shall be requested within 15 business days of receipt of the prescribed verification forms.(c) The insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested.. . .(e) All examinations under oath and medical examinations requested by the insurer shall be held at a place and time reasonably convenient to the applicant and medical examinations shall be conducted in a facility properly equipped for the performance of the medical examination. The insurer shall inform the applicant at the time the examination is scheduled that the applicant will be reimbursed for any loss of earnings and reasonable transportation expenses incurred in complying with the request. When an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination. Insurer standards shall be available for review by department examiners.. . .Section 65-3.6. Follow-up requirements. . .(b) Verification requests. At a minimum, if any requested verifications has not been supplied to the insurer 30 calendar days after the original request, the insurer shall, within 10 calendar days, follow up with the party from whom the verification was requested, either by telephone call, properly documented in the file, or by mail. At the same time the insurer shall inform the applicant and such person's attorney of the reason(s) why the claim is delayed by identifying in writing the missing verification and the party from whom it was requested.Therefore, the EUO attended by Dr. Ahmed on June 13, 2019 was an integral component of the No-Fault claims additional verification procedures for establishing proof of claim.

(D) Arbitration of No-Fault Insurance Disputes
When the Comprehensive Automobile Insurance Reparations Act ("No-Fault Law"), constituting a new article XVIII of the Insurance Law, was first enacted by the Legislature in Chapter 13 of the Laws of 1973 to take effect February 1, 1974, § 675 of the Insurance Law contained provisions for fair claims settlement. Subdivision 2 of § 675 compelled insurers to provide claimants with the option to arbitrate disputes. The following are the provisions enacted as § 675:
§ 675. Fair claims settlement1. Payments of first party benefits shall be made as the loss is incurred. Such benefits are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained. If proof is not supplied as to the entire claim, the amount which is supported by proof is overdue if not paid within thirty days after such proof is supplied. All overdue payments shall bear interest at the rate of two percent per month. The claimant shall also be entitled to recover his attorney's reasonable fee if a valid claim or portion thereof was overdue and such claim was not paid before the attorney was retained.2. Every insurer shall provide a claimant with the option of submitting any dispute involving the insurer's liability to pay first party benefits, the amount thereof, or any other matter which may arise under subdivision one of this section to binding arbitration pursuant to simplified procedures to be promulgated or approved by the superintendent.Amendments to the 1973 version of the No-Fault Law were enacted by the legislature in 1977 (Chapter 892), as mentioned above (see supra at 5).[FN18]
The essence of subdivision 1 of § 675 remained the same (the text of the provision providing for attorney's fees was reworded):
1. Payments of first party benefits shall be made as the loss is incurred. Such benefits are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained. If proof is not supplied as to the entire claim, the amount which is supported by proof is overdue if not paid within thirty days after such proof is supplied. All overdue payments shall bear interest at the rate of two percent per month. If a valid claim or portion thereof was overdue and such claim was not paid before an attorney was retained with respect to the overdue claim, the claimant shall also be entitled to recover his attorney's reasonable fee, which shall be subject to limitations promulgated by the superintendent in regulations. (L 1977, ch 892, § 13.)The 1977 amendments contained a major change to the arbitration provisions, in that master arbitration was added for the purpose of reviewing appeals of arbitration awards. With [*13]that particular amendment, subdivision 2 of § 675 was modified to read as follows:
2. Every insurer shall provide a claimant with the option of submitting any dispute involving the insurer's liability to pay first party benefits, the amount thereof, or any other matter which may arise under subdivision one of this section to arbitration[FN19] pursuant to simplified procedures to be promulgated or approved by the superintendent.
An award by an arbitrator may be vacated or modified by a master arbitrator in accordance with simplified procedures to be promulgated or approved by the superintendent. The grounds for vacating or modifying an arbitrator's decision by a master arbitrator shall not be limited to those grounds for review set forth in article seventy-five of the civil practice law and rules. The decision of a master arbitrator shall be binding except for the grounds for review set forth in article seventy-five of the civil practice law and rules, and provided further that where the amount of such master arbitrator's award is five thousand dollars or greater, exclusive of interest and attorney's fees, the insurer or the claimant may institute an action in a court of competent jurisdiction to adjudicate the dispute de novo.Nothing in the Governor's Bill Jacket for Chapter 892 of the Laws of 1977 or other contemporary records comments on the provision adopting master arbitration review of (hearing) arbitrators' decisions, so it is not known why the master arbitration process was created (see Matter of Bamond v Nationwide Mut. Ins. Co., 75 AD2d 812, 813 [2d Dept 1980], affd 52 NY2d 957 [1981]). This Court speculates that at least one reason was that No-Fault arbitration was compulsory and the Legislature desired to permit a party to an arbitration to seek review of the hearing arbitrator's award on the basis of an assertion of an error of law, which traditionally was not a basis for review in an Article 75 proceeding (see Mott v State Farm Ins. Co., 77 AD2d 488 [3d Dept 1980], revd sub nom. on other grounds Matter of Smith v Firemen's Ins. Co., 55 NY2d 224 [1982]).
The provisions regarding No-Fault insurance arbitration remained in the recodification of the Insurance Law enacted in Chapters 367 and 805 of the Laws of 1984. The fair claims settlement provisions, including those providing for arbitration, were set forth in § 5106, and subdivisions (a), (b), and (c) now read as follows:
(a) Payments of first party benefits and additional first party benefits[FN20] shall be made as the loss is incurred. Such benefits are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained. If proof is not supplied as to the entire claim, the amount which is supported by proof is overdue if not paid within thirty days after such proof is supplied. All overdue payments shall bear interest at the rate of two percent per month. If a valid claim or portion was overdue, the claimant shall also be entitled to recover his attorney's reasonable fee, for services necessarily [*14]performed in connection with securing payment of the overdue claim, subject to limitations promulgated by the superintendent in regulations.
(b) Every insurer shall provide a claimant with the option of submitting any dispute involving the insurer's liability to pay first party benefits, or additional first party benefits, the amount thereof or any other matter which may arise pursuant to subsection (a) of this section to arbitration pursuant to simplified procedures to be promulgated or approved by the superintendent. Such simplified procedures shall include an expedited eligibility hearing option, when required, to designate the insurer for first party benefits pursuant to subsection (d) of this section. The expedited eligibility hearing option shall be a forum for eligibility disputes only, and shall not include the submission of any particular bill, payment or claim for any specific benefit for adjudication, nor shall it consider any other defense to payment.(c) An award by an arbitrator shall be binding except where vacated or modified by a master arbitrator in accordance with simplified procedures to be promulgated or approved by the superintendent. The grounds for vacating or modifying an arbitrator's award by a master arbitrator shall not be limited to those grounds for review set forth in article seventy-five of the civil practice law and rules. The award of a master arbitrator shall be binding except for the grounds for review set forth in article seventy-five of the civil practice law and rules, and provided further that where the amount of such master arbitrator's award is five thousand dollars or greater, exclusive of interest and attorney's fees, the insurer or the claimant may institute a court action to adjudicate the dispute de novo.Insofar as is here relevant, the No-Fault Insurance Regulations promulgated by the Superintendent of Insurance provided that a master arbitrator may vacate or modify a hearing arbitrator's award where it "was incorrect as a matter of law (procedural or factual errors committed in the arbitration below are not encompassed within this ground)" (11 NYCRR 65.18 [a] [4]). This regulatory language was carried over into the revised Regulations promulgated in 2002, in 11 NYCRR 65-4.10 (a) (4).[FN21]
A master arbitrator may vacate or modify a hearing arbitrator's award under certain other grounds also (see 11 NYCRR 65-4.10 [a]).[FN22]

In comparing the textual provisions regarding arbitration in the present Insurance Law § 5106 (b) with that in § 675 (2) of the original No-Fault Law (enacted in 1973), they are basically the same. The addition of the words "or additional first party benefits" in the current version has no effect on the analysis of the present issue: whether No-Fault arbitration subject matter jurisdiction extends to claims for reimbursement of lost earnings sustained by a health service provider as a result of being summoned to an EUO. Thus, back in 1973 when the No-Fault Law was originally adopted and presently as well, the applicable statute compels the availability of arbitration for any dispute involving the insurer's liability to pay first party benefits, the amount thereof, or any other matter which may arise pursuant to the previous subdivision of the operative section in the Insurance Law (see Insurance Law § 5106 [b] [current]; § 675 [L 1973, ch 13, § 1]). Concomitantly, the previous subdivision has provided — back in 1973 and presently — that payments of first party benefits shall be made as the loss is incurred, and such benefits are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained (id.).
In reviewing historical materials concerning the enactment of the No-Fault Law in 1973, primarily the Governor's Bill Jacket, the Court did not locate any relevant commentary on the extent of the coverage of the mandated right to arbitration, with one exception discussed below. It is also noted that requesting an EUO as a component of the claim verification process did not exist when the legislation was first enacted.
As far as this Court is able to ascertain, while No-Fault insurers were seeking EUOs prior to 2002, it was in the overhaul of the Regulations which took effect that year on April 5, 2022, that the process of seeking EUOs as a component of the verification of claims process became formalized. The new Regulation No. 68 ("Regulations Implementing the Comprehensive Motor Vehicle Insurance Reparations Act"), codified at 11 NYCRR 65, which was subject to extensive [*15]litigation (see New York State Dept of Financial Servs., Legal History of No-Fault Regulation 68, available at https://www.dfs.ny.gov/apps_and_licensing/property_insurers/nofault_history [last accessed Jan. 25, 2026]), included a requirement in the Conditions section of the No-Fault endorsement to the motor vehicle liability insurance policy that as part of proof of claim, "Upon request by the Company, the eligible injured person or that person's assignee or representative shall: . . . (b) as may reasonably be required submit to examinations under oath by any person named by the Company and subscribe the same" (11 NYCRR 65-1.1 [d], included in Regulation No. 68, available at https://www.dfs.ny.gov/ apps_and_licensing/property_insurers/nofault_text [last accessed Jan. 25, 2026]). Also, the claim verification procedures included a reference to EUOs for the first time since the No-Fault Regulations had been promulgated in furtherance of the No-Fault Law (see 11 NYCRR 65-3.5, accessible at id.). The Regulations in effect previously did not do so (see 11 NYCRR 65.12 [e] ["Conditions"], 65.15 [d] [available at https://www.dfs.ny.gov/apps_and_licensing/property_insurers/nofault_old_reg68_pre04052 002 [last accessed Jan. 25, 2026]).
The one possibly relevant discussion of arbitration in commentaries on the No-Fault Law at the time of its adoption in 1973 which the Court was able to locate was set forth in New York Adopts No-Fault: A Summary and Analysis (37 Albany L Rev at 695 [1973] [emphasis added]):
In the event a dispute arises concerning the insurer's liability to pay "first party benefits," the claimant has an option of either submitting questions involving a fair claims settlement to binding arbitration, or bringing a contract action against the insurer to recover the unpaid amount. The language of the Act conceivably gives rise to a number of litigable issues, including, the amount of loss sustained, the validity of the claim, whether the loss arose from the "use or operation" of a motor vehicle, what constitutes a reasonable attorney's fee, and what portion of the claim is overdue. In the event the claimant elects to present the resolution of issues concerning the disputed liability to an arbitration board, the Superintendent of Insurance is given the authority to promulgate or approve the procedures to be followed. It should be noted that the Act refers to the rights of the "claimant" rather than the "insured," thereby indicating an intention to allow any person entitled to "first party benefits" to submit his claim to binding arbitration, regardless of whether he is privy to the insurance contract.

 To the extent that any guidance toward resolving the issue at hand is gleaned, it is that an expansive view of entitlement to arbitrate a dispute was contemplated.
 
 
 (E) Arbitration Subject Matter Jurisdiction

There being nothing in the legislative history of the adoption of the No-Fault Law specifically regarding the extent of the arbitration forum's subject matter jurisdiction, this Court first approaches the issue in this special proceeding — whether a claim for lost earnings incurred by a health service provider in attending an EUO requested by a No-Fault insurer lies within the statutorily-prescribed arbitration process — by reviewing the principles of statutory interpretation, the underlying purposes for enactment of the No-Fault Law, and the post-enactment treatment of the ambit of No-Fault insurance arbitration.
Last year, in determining that No-Fault arbitration awards cannot be aggregated for purposes of commencing a de novo action in court in order to meet the $5,000 threshold, the Appellate Division, Second Department, in American Tr. Ins. Co. v Comfort Choice [*16]Chiropractic, P.C. (239 AD3d 1, 6 [2d Dept 2025]), looked first to principles of statutory construction:[FN23]

In matters of statutory interpretation, the primary consideration is to discern and give effect to the Legislature's intent (see Yatauro v Mangano, 17 NY3d 420, 426 [2011]). "The starting point for discerning legislative intent is the language of the statute itself" (id. at 426). "Inasmuch as the text of a statute is the clearest indicator of such legislative intent, where the disputed language is unambiguous, [courts] are bound to give effect to its plain meaning" (Makinen v City of New York, 30 NY3d 81, 85 [2017] [alternation and internal quotation marks omitted]). "[T]he text of a provision 'is the clearest indicator of legislative intent and courts should construe unambiguous language to give effect to its plain meaning' " (Matter of Albany Law School v New York State Off. of Mental Retardation & Dev. Disabilities, 19 NY3d 106, 120 [2012], quoting Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]; see Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). "When the plain language of the statute is precise and unambiguous, it is determinative" (Matter of Washington Post Co. v New York State Ins. Dept., 61 NY2d 557, 565 [1984]; see Loehr v New York State Unified Ct. Sys., 150 AD3d 716, 720 [2017]).In relating the subject matter jurisdiction of No-Fault insurance arbitration, subdivision (b) of Insurance Law § 5106 mentions "first party benefits, or additional first party benefits, the amount thereof or any other matter which may arise pursuant to subsection (a) of this section." "First party benefits" are clear — they are defined in § 5102 (b) as basic economic loss minus certain setoffs (see supra at 9-10). Claims for lost earnings incurred resulting from attendance at the EUO are not first party benefits. Neither are such claims additional first party benefits (see supra at 14 n 20). Such claims are also not subsumed within "the amount thereof," inasmuch as that phrase refers to the amount of the first party or additional first party benefits. That leaves the phrase "any other matter which may arise pursuant to subsection (a) of this section."
Subdivision (a) of Insurance Law § 5102 discusses several matters: when first party and additional first party benefits are to be paid, when they become overdue after the claimant supplies proof of the fact and amount of loss sustained, partial payment when proof is supplied, when interest must be added on, and when an attorney's fee is payable. At first blush, a health service provider's lost earnings while attending an EUO at the behest of the No-Fault insurer is not a subject specifically mentioned in § 5102's subdivision (a). However, one must consider that an EUO is conducted upon demand by the No-Fault insurer as a component of the process of additional verification of claims (see supra at 11-12). Once a claim has been verified, it is subject to payment: "No-fault benefits are overdue if not paid within 30 calendar days after the insurer receives proof of claim, which shall include verification of all of the relevant information requested pursuant to section 65-3.5 of this Subpart. In the case of an examination under oath or a medical examination, the verification is deemed to have been received by the insurer on the day the examination was performed." (11 NYCRR 65-3.8 [a] [1].) Since an EUO is an integral [*17]component of the additional verification of claims process and proof of claim is not complete until all proof, i.e., additional verification, has been supplied, any matter related to the process of submitting proof of claim must be subject to arbitration. After all, subdivision (a) requires full or partial payment when proof of claim is supplied. Thus, compensation for lost earnings occasioned by attendance at an insurer-demanded EUO would be subsumed within the ambit of "any other matter which may arise pursuant to subsection (a) of this section" (Insurance Law § 5106 [b]). This is especially so since the No-Fault Regulations themselves compel "reimburse[ment] for any loss of earnings and reasonable transportation expenses incurred in complying with the request" (11 NYCRR 65-3.5 [e]). Also, the No-Fault insurance endorsement to the motor vehicle liability policy, mandated by the No-Fault Regulations, includes the following regarding arbitration: "In the event any person making a claim for first-party benefits and the Company do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration pursuant to procedures promulgated or approved by the Superintendent of Financial Services" (11 NYCRR 65-1.1 ["Arbitration"] [emphasis added]). This leads one to conclude that when this was promulgated by the Insurance Department (now Department of Financial Services), it was contemplated that all matters involving claims submitted to the insurer would be arbitrable.
Further, even if lost earnings incurred for attending an EUO are not first party benefits per se they are incidental to the submission of complete proof of claim leading up to payment of first party benefits. As such, the phrase "any dispute involving the insurer's liability to pay first party benefits" should be deemed to subsume lost earnings incurred for attending an EUO demanded by the insurer as part of the additional verification process.
This broad construction of subdivisions (a) and (b) of Insurance Law § 5106 to encompass arbitration of the amount of compensation for attending an insurer-demanded EUO is consistent with the underlying purposes for enactment of the No-Fault Law, as related over decades of decisions in No-Fault insurance litigation, which included reduction of the burden placed on courts to adjudicate disputes over motor vehicle accidents (see supra at 7-9).
Construing the legislation at issue to allow a court to exercise its discretion in determining whether to treat separate arbitral awards as, in effect, one collective arbitral award for the purposes of establishing subject matter jurisdiction is contrary to the stated purpose of the legislation. Such construction could greatly expand the number of such cases heard by a court, rather than reduce the number of these types of cases within the court system, as anticipated by the enactment of the statutes.Thus, even if the language in the legislation did not unambiguously state that a single arbitral award, rather than a collective set of arbitral awards, must equal or exceed $5,000 in order to meet the jurisdictional threshold establishing subject matter jurisdiction such that a court could undertake a de novo review of the arbitral award, construing the legislation as so doing supports the legislative intent to promptly resolve no-fault reimbursements, "reduce the burden on the courts and to provide substantial premium savings to New York motorists" (Viviane Etienne Med. Care, P.C. v Country-Wide Ins. Co., 25 NY3d 498, 505 [2015] [internal quotation marks omitted] [plaintiff medical provider demonstrated entitlement to summary judgment in a no-fault insurance action, as the provider submitted evidence that payment of no-fault benefits was overdue and proof that its claim was mailed to and received by the defendant insurer]; see Contact Chiropractic, P.C. v New York City Tr. Auth., 31 NY3d 187, 194-196 [2018] [stating that [*18]the no-fault law is aimed at ensuring prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts, and to provide substantial premium savings to New York motorists, and holding that a three-year statute of limitations, not six-year statute of limitations, applies]; Matter of Medical Socy. of State of NY v Serio, 100 NY2d 854, 860 [2003] [challenged regulations reducing notice and claim filing time frames were fully consistent with the Insurance Law since "(t)he primary aims of this new system were to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial premium savings to New York motorists"]). (American Tr. Ins. Co. v Comfort Choice Chiropractic, P.C. (239 AD3d at 9-10.)Further support for the conclusion arrived at herein lies in the various decisions issued during the early days of the No-Fault insurance system, wherein the arbitration of disputes of various sorts was treated with approbation. Arbitration of the following subjects was held appropriate: whether a policy was cancelled or in effect (see Matter of Nassau Ins. Co. v McMorris, 41 NY2d 701 [1977]; Matter of Empire Mut. Ins. Co. [Faulkner], 52 AD2d 668 [3d Dept 1976]); involvement in the accident (see Matter of Walker [Government Empls. Ins. Co.], 54 AD2d 911 [2d Dept 1976]); whether there were one or two accidents (see Fireman's Fund Ins. Cos. v Garrison, 90 AD2d 824 [2d Dept 1984]); employee's claim against employer for first party benefits regarding injuries sustained while in course of employment (see Ryder Truck Lines v Maiorano, 44 NY2d 364 [1978]); and causation of claimed injuries (see Matter of Kolesnik [State Farm Mut. Auto. Ins. Co.], 266 AD2d 630 [3d Dept 1999]). "[I]t is now well settled that 'no fault' arbitration is very broad in contrast to uninsured motorist arbitration and the former includes 'such threshold issues as the question of involvement in the accident' " (Matter of Phillips [Allcity Ins. Co.], 57 AD2d 516, 516 [1st Dept 1977] [citations omitted]). Later on, another issue — fraudulent incorporation of health service provider — was held to be arbitrable (see Matter of Countrywide Ins. Co. v DHD Med., P.C., 86 AD3d 431 [1st Dept 2011]).
"The insurance policy at issue here contains a broad agreement to arbitrate 'any matter relating to the claim' and thus it is for the arbitrator to decide whether respondent was intoxicated and thus not entitled to no-fault benefits under the policy" (Matter of New York Cent. Mut. Fire Ins. Co. [Valois], 6 AD3d 1183, 1184 [4th Dept 2004] [citations omitted] [emphasis added]). In the context of "any matter relating to the claim," as used in the No-Fault Regulations applicable to self-insurers, it was held, "Certainly, in its use of the terminology 'any matter' there was no intention to restrict but rather to enlarge upon the scope of the inquiry. This scope in the opinion of the court is 'any matter relating to the claim' and includes, but is not merely limited to, a determination of the issue of liability itself, as well as all of the aspects and elements which go to the issue of such liability to pay, one of which is the issue of whether or not claimant is a 'covered person' within the purview of subdivision 10 of section 671 of the Insurance Law." (Matter of Green Bus Lines [Bailey], 80 Misc 2d 483, 485 [Sup Ct, Queens County], affd 50 AD2d 924 [2d Dept 1975]). The arbitration provision for claims against self-insurers set forth at 11 NYCRR 65-2.4 (d) mirrors that in the No-Fault policy endorsement prescribed in 11 NYCRR 65-1.1 (d) ("Arbitration") (see supra at 18).
It was also held that assignees of claimants were also imbued with the right to arbitrate No-Fault matters. "The term 'claimant' in subdivision 2 of section 675 of the Insurance Law [*19]encompasses assignees of medical claims against insurance carriers, and there is no indication in the statute that the Legislature did not intend to require insurers to arbitrate disputed claims assigned to such persons" (Matter of Rosenblum [Government Empls. Ins. Co.], 41 NY2d 966 [1977]). ENS Medical, P.C. is the assignee of four covered persons.
"It is always useful to bear in mind that the announced policy of this State favors and encourages arbitration as a means of conserving the time and resources of the courts and the contracting parties" (Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am., 37 NY2d 91, 95 [1975]). "While the provisions of section 675 of the Insurance Law and the terms of the standard no-fault policy cannot be likened precisely in form to what has come to be known as a 'broad arbitration clause,' there can be no doubt that the sweep of the statute and policy provision is at least as encompassing as a broad arbitration clause; indeed it can be argued that the Legislature intended to impose an even more sweeping obligation to arbitrate under no-fault insurance than that under a broad arbitration clause" (Matter of Nassau Ins. Co. v McMorris, 41 NY2d at 702).
Thus, from the earliest days of implementation of the No-Fault insurance system, it was recognized that the legislature desired to ensconce disputes arising thereunder within the arbitration forum — not in the courthouse. "The very objective of the legislation requiring no-fault coverage was to remove from the courts and to place before the arbitrators a specific class of litigation" (Allcity Ins. Co. [Robinson], 87 Misc 2d 634, 636 [Sup Ct, NY County 1976]). "The primary purpose of the compulsory arbitration provisions under the no-fault law is to effectuate speedy and efficacious determinations of disputes as to first party benefits. As to disputes regarding health services, and particularly disputes involving charges in excess of the fee schedule, the regulations specifically provide for utilization of persons of expertise and training in these areas as arbitrators, to promote consistent application of fee schedules in no-fault and workers' compensation cases. (Country-Wide Ins. Co. v Frolich, 119 Misc 2d 1089, 1092 [Civ Ct, Kings County 1983]). "The social principles of 'no-fault' legislation lend persuasion to relatively quick arbitrative channels rather than judicial ones" (Banner Cas. Co. v Fox, 86 Misc 2d 772, 774 [Sup Ct, Nassau County 1976]). "Part of the legislative design of the 'no-fault' auto liability statute (Insurance Law § 670 et seq.), traces the removal of certain motor vehicle accident cases from the courthouse. To the extent that design is clear, cases which cannot enter through the front door should find the back door locked as well. The disputative key is arbitration." (Id. at 772.)
In Roggio v Nationwide Ins. Co. (66 NY2d 260 [1985]), the Court of Appeals expressed its disapproval of some aspects of a No-Fault claim resulting from a motor vehicle accident being tried in court and others determined in arbitration. Notably, the Court wrote:
A legislative objective in enacting the No-Fault Law was to reduce significantly the burden of automobile personal injury litigation on the courts (Memorandum of State Executive Department, 1977 McKinney's Session Laws of NY, at 2445, 2448; Governor's Message of Approval of L 1977, ch 892, id., at 2534, 2535). Reading into Insurance Law § 5106 (b) an option to litigate after disappointments in arbitration is obviously inconsistent with this legislative purpose.Moreover, the clear thrust of section 5106 is to provide no-fault claimants with an opportunity for immediate redress, and by arbitration to offer a mechanism where disputes over reimbursable expenses can be resolved more swiftly and economically than is generally possible in plenary suits. Toward this end, both the statute and the [*20]regulations governing health service arbitrations clearly contemplate multiple disputes arising out of the same accident (Insurance Law § 5106 [b]; 11 NYCRR 65.16 [c] [5] [i]), which—when all are in arbitration—can be consolidated for efficient disposition (11 NYCRR 65.16 [c] [5] [i]). Further illustrative of this purpose is the amendment of Insurance Law § 5106 expanding the jurisdiction of arbitration panels to include in a single proceeding resolution of disputes as to additional first-party benefits as well as basic first-party benefits (L 1973, ch 13, as amended by L 1981, ch 340; see also, Chapter Law Memorandum, ch 340, 1981 NY Legis Ann, at 193). The objective of providing an efficient informal mechanism for recovery of benefits is disserved if a claimant can arbitrate disputes as to certain expenses and also litigate disputes as to other expenses arising out of one accident. (66 NY2d at 264.)In promulgating new No-Fault Regulations in 2002, the then Superintendent of Insurance (now Superintendent of Financial Services) used a wide-ranging term in construing Insurance Law § 5106's mandate: "no-fault disputes" (11 NYCRR 65-4.2 [a] [1]). "Section 5106 of the Insurance Law requires that the Superintendent of Financial Services promulgate simplified procedures for the resolution by arbitration of no-fault disputes" (id. [emphasis added]). The term used was not "basic economic loss" or "first party benefits." "No-fault disputes" would encompass any form of dispute arising under the New York No-Fault Law or the regulations enacted to implement it.
That neither the denial of claim Form NF-10 nor the Form AR-1 arbitration request form contains spaces to list the particulars of disputes regarding lost earnings incurred by claimants or assignees attending required EUOs — a point noted by the hearing arbitrator in this case (see NYSCEF Doc No. 5 at 5) — is not a reason to hold that the subject matter is not arbitrable. The Form AR-1 also does not list a space to set forth a policy issue without an amount of benefits being sought, yet such an issue is arbitrable.
The No-Fault insurance "scheme is comprised of a thicket of rules and regulations" (Aetna Health Plans v Hanover Ins. Co., 27 NY3d 577, 590 [2016, Fahey, J., dissenting]). No-Fault insurance arbitrators are familiar with them. Combined with the announced preference for arbitration to be the forum for resolution of disputes over No-Fault first party benefits, the familiarity with the rules and regulations possessed by the arbitrators militates toward interpreting Insurance Law § 516 (b) as broadly as possible so as to encompass the dispute herein as a matter of public policy.
Taking into account the principles of statutory construction, the history of and policies underlying the No-Fault Law, a preference for arbitration over court litigation with respect to No-Fault insurance disputes, early court decisions construing the subject matter of No-Fault insurance arbitration, the No-Fault arbitration regulations, and public policy favoring arbitration, the Court concludes that in prescribing the subject matter jurisdiction of such arbitration, Insurance Law § 5106 (b) does encompass disputes concerning lost earnings incurred from attending an EUO demanded by the insurer as part of the additional verification process.
The No-Fault arbitration regulations provide: "The no-fault arbitration request form shall be prescribed by the designated organization and approved by the superintendent" (11 NYCRR 65-4.2 [b] [1] [ii]). Since lost earnings resulting from attendance at an EUO are not a component of first party benefits but remain arbitrable pursuant to the determination herein, this will necessitate modification of the arbitration request form prescribed by the American Arbitration [*21]Association, as the designated organization.

V. Determinations

 (A) Motion Sequence No. 1 — Petition to Vacate Master Arbitration Award & Commanding Superintendent to Promulgate Arbitration Procedures
Although the Court concludes that subject matter jurisdiction reposes in the No-Fault insurance arbitration tribunal to entertain the subject dispute, it nonetheless confirms the master arbitration award.
Last year, the Appellate Division, Second Department summarized the decisional law regarding CPLR Article 75 reviews of No-Fault insurance master arbitration awards:
"A court reviewing the award of a master arbitrator is limited to the grounds set forth in CPLR article 75, which include, in this compulsory arbitration, the question of whether the determination had evidentiary support, was rational, or had a plausible basis" (Matter of Acuhealth Acupuncture, P.C. v Country-Wide Ins. Co., 176 AD3d 800, 802 [2019]; see Matter of Petrofsky [Allstate Ins. Co.], 54 NY2d 207, 212 [1981]). "[A] master arbitrator's determination of the law need not be correct: mere errors of law are insufficient to set aside the award of a master arbitrator" (Matter of Advanced Orthopaedics, PLLC v Country-Wide Ins. Co., 204 AD3d 787, 787 [2022]; see Acuhealth Acupuncture, P.C. v Country-Wide Ins. Co., 170 AD3d 1168 [2019]). "If the master arbitrator vacates the arbitrator's award based upon an alleged error of a rule of substantive law, the determination of the master arbitrator must be upheld unless it is irrational" (Matter of Advanced Orthopaedics, PLLC v Country-Wide Ins. Co., 204 AD3d at 787 [internal quotation marks omitted]; Matter of Acuhealth Acupuncture, P.C. v Country-Wide Ins. Co., 176 AD3d at 802).Here, the Supreme Court properly denied the petition to vacate the award of the master arbitrator, as it was not irrational or arbitrary and capricious (see Matter of Bay Needle Care Acupuncture, P.C. v Country Wide Ins. Co., 176 AD3d 695, 696 [2019]; L.I. Community Med., P.C. v Allstate Ins. Co., 19 Misc 3d 142[A], 2008 NY Slip Op 51034[U] [App Term, 2d Dept, 2d & 11th Jud Dists 2008]; Elite Med. Care, P.C. v Travelers Prop. & Cas. Ins. Co., 12 Misc 3d 1183[A], 2006 NY Slip Op 51397[U] [Civ Ct, Kings County 2006]). "On questions of substantive law, the determination of the master arbitrator must be upheld if, as here, there is a rational basis for the determination" (Matter of Bay Needle Care Acupuncture, P.C. v Country Wide Ins. Co., 176 AD3d at 696). (Matter of South Nassau Community Hosp. v Avis Budget Group, Inc., 242 AD3d 1207, 1209-1209 [2d Dept 2025].)Similarly, in its most recent pronouncement, the Second Department stated:
"[A]n arbitrator's rulings, unlike a trial court's, are largely unreviewable" (Matter of Falzone [New York Cent. Mut. Fire Ins. Co.], 15 NY3d 530, 534). "A court reviewing the award of a master arbitrator is limited to the grounds set forth in CPLR article 75" (Matter of Acuhealth Acupuncture, P.C. v Country-Wide Ins. Co., 176 AD3d 800, 802; see 11 NYCRR 65-4.10[h]). Significantly, a master arbitrator's determination is not subject to vacatur by the courts on the basis of an error of law, including, " 'the incorrect [*22]application of a rule of substantive law,' " unless the master arbitrator's determination is irrational (Matter of Acuhealth Acupuncture, P.C. v Country-Wide Ins. Co., 176 AD3d at 802, quoting Matter of Smith [Firemen's Ins. Co.], 55 NY2d 224, 232; see Matter of Falzone [New York Cent. Mut. Fire Ins. Co.], 15 NY3d at 534).Here, regardless of any errors of law the arbitrator and master arbitrator made regarding burdens of proof, the master arbitrator's determination to affirm the April 2022 award to the provider was rationally based on the conclusion that Dixon's minor delay in providing the insurer with notice of the accident was reasonably justified because she was a passenger in the vehicle involved in the accident and, thus, was not making a claim to her own insurance company (see 11 NYCRR 65-3.5[l]). Because the master arbitrator's affirmance of the April 2022 award had a rational basis, and " '[i]t is not for the court to decide whether the master arbitrator erred in applying the applicable law,' " the petition to vacate the master arbitrator's award should have been denied and the master arbitrator's award confirmed (Matter of Allstate Ins. Co. v Westchester Med. Group, M.D., 125 AD3d 649, 650 [alterations and internal quotation marks omitted], quoting Matter of Falzone [New York Cent. Mut. Fire Ins. Co.], 15 NY3d at 535; see Matter of Acuhealth Acupuncture, P.C. v Country-Wide Ins. Co., 176 AD3d at 802; Matter of Singh v Allstate Ins. Co., 137 AD3d 1046, 1047; Matter of Travelers Indem. Co. v United Diagnostic Imaging, P.C., 70 AD3d 1043, 1043-1044). (Matter of American Tr. Ins. Co. v Atlantic Med. Care, P.C., 244 AD3d 1104, 1105-1106 [2d Dept 2025].)In affirming Arbitrator Philipson, Master Arbitrator Alfred J. Weiner found that "the determination of the no-fault arbitrator is not arbitrary, capricious or contrary to law" (NYSCEF Doc No. 6 at 3), as noted above (see supra at 4). In doing so, he quoted from Arbitrator Philipson's award, wherein she reasoned that neither the Insurance Law nor the No-Fault Regulations allowed an insured or their assignee to arbitrate a claim for lost earnings resulting from an appearance at an EUO. Reimbursement for testifying at an EUO was not basic economic loss. Arbitrator Philipson added that basic economic loss encompassed medical treatment, lost wages, and interest. That part of her award not quoted in the master arbitration award contained further analysis: that the lost earnings attendant to attending an EUO is not a category of benefits listed on official No-Fault insurance forms.
Arbitrator Philipson's analysis of the issue presented was neither irrational, arbitrary, nor capricious considering that Insurance Law § 5106 (b) does not explicitly provide for arbitration of reimbursement to those attending EUOs. Her conclusion certainly was plausible. After all, the reimbursement at issue is not a first party benefit. The issue arises only because the No-Fault Regulations were amended effective 2002 to specifically include an EUO as a component of additional verification of a claim and a provision requiring reimbursement. The No-Fault Law nowhere refers to EUOs and reimbursement for appearing. It is only after careful consideration of a multitude of factors that this Court concluded that disputes over such reimbursement were arbitrable. Hence, even if Arbitrator Philipson, and ergo Master Arbitrator Weiner, were incorrect on the law, such an error is insufficient to set aside the award of a master arbitrator. Not only must the petition to vacate the master arbitration award be denied, it must be confirmed (see CPLR 7511 [e]).
To the extent ENS Medical, P.C. seeks an order commanding the Superintendent of Financial Services, in her role as the regulator of the No-Fault insurance process, to promulgate [*23]arbitration procedures with respect to claims for reimbursement of lost earnings when attending an EUO, the petition must likewise be denied. Although the Court disagrees with the Superintendent in her argument that the subject dispute over reimbursement is not arbitrable, whether it must issue a regulation governing the subject matter is within her discretion. ENS Medical, P.C. has failed to demonstrate a clear right to the requested relief and a corresponding ministerial, nondiscretionary duty on the part of the respondent to provide such relief (see Alliance to End Chickens as Kaporos v New York City Police Dept., 32 NY3d 1091 [2018]; Clements v New York Secretary of State, 227 AD3d 84 [3d Dept 2024]).[FN24]

Nonetheless, the Court notes that Petitioner ENS Medical P.C. sought "such other and further relief as the Court deems just and proper" (NYSCEF Doc No. 8). The within dispute regarding arbitrability of lost earnings resulting from attendance at an EUO is capable of repetition yet evading review. The issue is not moot even though the master arbitration award at issue is herewith confirmed. No-Fault insurers are constantly demanding EUOs of No-Fault insurance claimants and their assignee health service providers. It is manifest that the designated organization, the American Arbitration Association, must modify its arbitration request form to accommodate requests involving compensation for EUO attendance where the claimant or assignee and the respective insurance company are unable to agree on the amount (see supra at 21-22).
While the Superintendent of Insurance possesses discretion how to formulate her No-Fault Insurance Regulations, the designated organization may be commanded to modify its procedures (see Brady v Williams Capital Group, L.P., 14 NY3d 459, 465 [2010], Matter of Belanger v State Farm Mut. Auto. Ins. Co., 74 AD2d 938 [3d Dept 1980]; State Mut. Auto. Ins. Co. v Mercado, 70 AD2d 513 [1st Dept 1979]; Santana v Country-Wide Ins. Co., 177 Misc 2d 1 (Civ Ct, Queens County 1998), affd 184 Misc 2d 294 [App Term 2d Dept 2000]; Matter of Seligman v Allstate Ins. Co., 195 Misc 2d 553 [Sup Ct, Nassau County 2003]). "[A] court may grant relief that is warranted by the facts plainly appearing on the papers on both sides, if the relief granted is not too dramatically unlike the relief sought, the proof offered supports it, and there is no prejudice to any party" (Frankel v Stavsky, 40 AD3d 918 [2d Dept 2007]). The main issue herein of whether disputes over lost earnings resulting from attendance at an EUO are arbitrable pursuant to Insurance Law § 5102 (b) was addressed by all parties, so directing the American Arbitration Association to perform a ministerial function of modifying its form for filing for arbitration is but a logical consequence of the Court's determination and in response to the petitioner's general prayer for relief. The absence of the American Arbitration Association as a party is not a bar to relief inasmuch as its role as the designated organization is akin to that of a court clerk who must obey statutes and regulations (see Matter of Seligman v Allstate Ins. Co., 195 Misc 2d 553).

(B) Motion Sequence No. 2 — Respondent Superintendent's Cross-Motion To Deny Petition & Dismiss Proceeding
For the reasons set forth above in regard to Motion Sequence No. 1, the Superintendent of Financial Services is entitled to the relief she requests.

(C) Motion Sequence No. 3 — Respondent Nationwide's Cross-Motion To Deny Petition & Dismiss Proceeding
Nationwide contends that the arbitration award and the master arbitration award should be confirmed. For the reasons set forth above with respect to Motion Sequence No. 1, Nationwide is entitled to this relief.
Nationwide also moves for denial and dismissal of ENS Medical, P.C.'s petition on the ground that the respondent in the arbitration proceedings was Nationwide Property & Casualty Insurance Company, whereas the respondent insurance company in the within special proceeding was designated as "Nationwide Ins. Co.," which does not exist. The Court takes judicial notice that the insurance company formally known as Nationwide Property & Casualty Insurance Company is frequently called "Nationwide Insurance Company" or an abbreviated format of that name. Here, Nationwide did receive the papers commencing this special proceeding, defended on the merits, and was not prejudiced by the misdescribed company name. As such, the Court sua sponte deems the caption to name Nationwide Property & Casualty Insurance Company as the respondent insurance company (see Sealey v National Grange Ins. Co., 238 AD3d 927 [2d Dept 2025]; cf. Odessa Med. Supply, Inc. v Kemper Auto & Home Ins. Co., 20 Misc 3d 145[A], 2008 NY Slip Op 51868[U] [App Term, 2d, 11th & 13th Dists. 2008]).
Nationwide's other jurisdictional ground for moving to dismiss is that it was improperly served pursuant to CPLR 312-a. Proof of service did not establish that two copies were served as said section provides. There was also no proof that an acknowledgment of receipt was returned to the sender.
ENS Medical, P.C. contends in response that service was effectuated through CPLR 311 and the Business Corporation Law. No section in the Business Corporation Law is cited. The contention by ENS Medical, P.C. is that due to Covid, Corporation Service Company was accepting service on it, as agent for Nationwide, by mail.
Nationwide has not refuted that Corporation Service Company was accepting service on it, as agent for Nationwide, by mail. Clearly it has not been prejudiced. It was able to adequately interpose its defense on the merits. In fact, the Court agrees with Nationwide's position that in the context of the arbitration proceedings which took place, there is no room for vacatur under the case law regarding court review of master arbitration — even if errors of law took place in the arbitration. This argument by Nationwide was clear during oral argument and while the Court disagrees with Nationwide on the merits of the issue presented, the arbitration and master arbitration awards were neither irrational, arbitrary, nor capricious; their conclusions were plausible. The Court could grant an extension of time to serve the commencement papers properly pursuant to CPLR 306-b but that would be wasteful of the Court's time, as well as that of the parties. Adjudication of the underlying dispute is in the interests of all concerned. Therefore, the Court deems the commencement papers properly served nunc pro tunc.

(D) Motion Sequence No. 4 — Petitioner's Cross-Motion to Extend Time to Cure Service Defect, Deem Petition Timely and Properly Served & for Associated Relief
ENS Medical, P.C. seeks to have the commencement papers deemed timely served nunc pro tunc. For the reasons set forth with respect to Motion Sequence No. 3, the Court grants this relief. Since ENS Medical, P.C. is not the prevailing party in this special proceeding, it is not entitled to the other relief sought in Motion Sequence No. 4, to wit, attorney's fees, costs, and disbursements.
As for attorney's fees, the Court does not agree with ENS Medical, P.C.'s position that it would be entitled to them had it prevailed by obtaining vacatur of the master arbitration award. While the Court holds that the No-Fault arbitration forum is a proper venue for adjudicating disputes over alleged lost earnings occasioned by attending an EUO demanded as part of the additional verification process, it does not necessarily follow that one who successfully obtains such reimbursement is entitled to attorney's fees, or interest for that matter. Insurance Law § 5106 is clear that interest and attorney's fees are to be awarded in connection with overdue claims for first party benefits. Lost earnings resulting from attending an EUO are not first party benefits. There is no 30-day deadline for paying them. The purpose underpinning the interest and attorney's fees provision in Insurance Law § 5106 (a) is to encourage insurance companies to timely pay No-Fault benefits claims. The additional verification protocols did not even exist when the predecessor provision, § 675 (a), was enacted in 1973. It could never have been contemplated at that time that reimbursement for acceding to additional verification requests would carry interest and attorney's fees. In any event, this issue is academic since the subject master arbitration award is confirmed.

 VI. Conclusion
It is hereby ORDERED and ADJUDGED that the within special proceeding, commenced by Petitioner ENS Medical, P.C., with an address c/o GT PC, 129 Livingston Street, Brooklyn, NY 11201, against Respondent Nationwide Property & Casualty Insurance Company s/h/a Nationwide Ins. Co., with an address care of Hollander Legal Group, P.C., 105 Maxess Road, Suite S128, Melville, NY 11747, and Respondent Kaitlin Asrow, as the Acting Superintendent of the New York State Department of Financial Services, with an address of 1 State Street, New York, NY 10004, is determined as follows:
(1) The master arbitration award in American Arbitration Association Case No. 99-22-1262-9216 of Master Arbitrator Alfred J. Weiner, which affirmed the award of Arbitrator Tali Philipson, is confirmed in its entirety.
(2) The petition herein of Petitioner ENS Medical, P.C., denoted as Motion Sequence No. 1, is granted solely to the extent indicated herein, to wit, ordering the American Arbitration Association to modify its prescribed arbitration request form to include a space for the listing of compensation for attendance at an examination under oath as a disputed matter; otherwise, the petition is denied and the special proceeding is dismissed as against all Respondents.
(3) Motion Sequence No. 2, a cross-motion by Respondent Superintendent of the Department of Financial Services seeking denial and dismissal is granted to the extent indicated herein, to wit, denial of the petition and dismissal of the special proceeding insofar as it was maintained against said Respondent, on the ground that mandamus does not lie against said Respondent with respect to the relief requested by Petitioner ENS Medical, P.C. to direct said Respondent to promulgate certain arbitration procedures.
(4) Motion Sequence No. 3, a cross-motion by Respondent Nationwide Property & [*24]Casualty Insurance Company s/h/a Nationwide Ins. Co. is granted to the extent indicated herein, to wit, denial of the petition and dismissal of the special proceeding insofar as it was maintained against said Respondent, on the ground that the subject master arbitration award is hereby confirmed.
(5) Motion Sequence No. 4, a cross-motion by Petitioner ENS Medical, P.C. is granted to the extent indicated herein, to wit, deeming the papers commencing this special proceeding to have been timely and properly served nunc pro tunc against Respondent Nationwide Property & Casualty Insurance Company.
(6) The Court charges counsel for the parties with the duty of serving a copy of this decision, order, and judgment on the American Arbitration Association, which is hereby ordered to modify its prescribed No-Fault arbitration request form in accordance herewith.

Footnotes

Footnote 1:The term "hearing arbitrator" — who is referred to simply as "arbitrator" in Insurance Law § 5106 (c) — is used by the Court to distinguish the original arbitrator from the master arbitrator.

Footnote 2:A petition in a special proceeding is not a motion. For a discussion of this topic, see Matter of Hans-Gaston v Sunshine, Misc 3d , 2025 NY Slip Op 25241 [Sup Ct, Kings County 2025]. The Court refers to the petition as Motion Sequence No. 1 since such a designation was made by Supreme Court case management platforms.

Footnote 3:The named Respondent Superintendent of Financial Services was Adrienne A. Harris. Ms. Harris resigned in September 2025. The present Acting Superintendent is Kaitlin Asrow, and the Court deems her the named Respondent Superintendent.

Footnote 4:The Court will refer to this Respondent, for the most part, as "Nationwide."

Footnote 5:The delay by the Court in issuing this decision, order, and judgment was due to the need to procure historical materials in connection with the enactment of the No-Fault Law and contemporaneous commentary.

Footnote 6:The American Arbitration Association has been designated by the New York State Department of Financial Services to conduct No-Fault insurance arbitration as the designated organization (see 11 NYCRR 65-4.2 [a]).

Footnote 7:The terms subsection and subdivision refer to the initial division within a statute's section. The Tanbook prefers "subdivision" (see New York Law Reports Style Manual § 3.1 (b) (1) (b) [2022 & 2024 Update]), but Insurance Law § 5106 (b) uses "subsection." The pre-recodification version, § 675 (2), used "subdivision."

Footnote 8:Serious injury was defined in the 1973 legislation as follows:
 "Serious injury" means a personal injury:
(a) which results in death; dismemberment; significant disfigurement; a compound or comminuted fracture; or permanent loss of use of a body organ, member, function, or system; or
 
(b) if the reasonable and customary charges for medical, hospital, surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services necessarily performed as a result of the injury would exceed five hundred dollars (L 1973, ch 13, § 1, enacting Insurance Law § 671 [4]).

Footnote 9:When it took effect on February 1, 1974, the legislation appeared as §§ 670-677 in a new Article XVIII of the Insurance Law. The 1984 recodification of the Insurance Law resulted in the No-Fault Law appearing therein as Article 51 (see L 1984, ch 367; L 1984, ch 805), and presently the sections are numbered 5101-5109.

Footnote 10:The nine categories are as follows:
"Serious injury" means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment (Insurance Law § 5102 [d]).

Footnote 11:Although neither Insurance Law Article 51 nor its predecessor Article XVIII mentioned the term "No-Fault," the appellation "No-Fault" came into use in common parlance shortly after the 1973 enactment in order to describe the post-motor vehicle accident loss compensation system. "No-Fault" is more commonly used to describe economic loss benefits (health service expenses and lost earnings), as compared to the serous injury limitation for non-economic loss (pain and suffering).

Footnote 12:The No-Fault system of compensation for economic loss includes being able to purchase optional basic economic loss and additional first party benefits, but for purposes of this decision, they are not relevant.

Footnote 13:"Personal injury protection," also known as "PIP" is a term created in the No-Fault Regulations as a synonym for first party benefits.

Footnote 14:The prescribed claim forms are included within 11 NYCRR Part 65 (Regulation 68) Appendix 13. Besides Form NF-3 (verification of treatment by attending physician or other provider of health service), Appendix 13 contains Form NF-4 (verification of hospital treatment) and Form NF-5 (hospital facility form). Not every No-Fault insurance provider uses the prescribed forms; some utilize a HICF (Health Insurance Claim Form) or a UB-04 form more commonly used for inpatient and outpatient claims billed by hospitals, healthcare facilities, and surgical facilities.

Footnote 15:There is a prescribed assignment of benefits form (Form NF-AOB) in 11 NYCRR Part 65 (Regulation 68) Appendix 13.

Footnote 16:The process of submitting a No-Fault claim to the insurer is governed by 11 NYCRR Subpart 65-3, which contains §§ 65-3.1 et seq.

Footnote 17:Form NF-10 is also included within 11 NYCRR Part 65 (Regulation 68) Appendix 13.

Footnote 18:Among the more substantial changes in the 1977 legislation were the adoption of fee schedules to limit health service expenses, removal of motorcycle occupants as recipients of No-Fault benefits, adding a $2,000 death benefit, and modification of the serious injury threshold categories for suing for noneconomic loss, i.e., pain and suffering.

Footnote 19:The word "binding" before "arbitration was deleted. Perhaps it was considered redundant.

Footnote 20:Additional first party benefits, known as "APIP," are provided for in the No-Fault Regulations. They enable a policyholder to purchase additional insurance coverage for first-party benefits. This is similar to optional basis economic loss ("OBEL"); there are differences in coverage which are not relevant to the issues at hand in this special proceeding.

Footnote 21:Most non-No-Fault insurance arbitration awards cannot be vacated due to an error of law (see Matter of Sprinzen v Nomberg, 46 NY2d 623, 629-630 [1979]). No-Fault insurance arbitrations are different; an error of law may be the basis for reversal — by a master arbitrator.

Footnote 22:11 NYCRR 65-4.10 (a) provides as follows:
 Grounds for review. An award by an arbitrator rendered pursuant to section 5106(b) of the Insurance Law and section 65-4.4 or 65-4.5 of this Subpart may be vacated or modified solely by appeal to a master arbitrator, and only upon one or more of the following grounds:
 
 
 (1) any ground for vacating or modifying an award enumerated in article 75 of the Civil Practice Law and Rules (an article 75 proceeding), except the ground enumerated in CPLR subparagraph 7511(b)(1)(iv) (failure to follow article 75 procedure);

 
 (2) that the award required the insurer to pay amounts in excess of the policy limitations for any element of first-party benefits; provided that, as a condition precedent to review by a master arbitrator, the insurer shall pay all other amounts set forth in the award which will not be the subject of an appeal, as provided for in section 65-4.4 or 65-4.5 of this Subpart;
 
 
 (3) that the award required the insurer to pay amounts in excess of the policy limitations for any element of additional first-party benefits (when the parties had agreed to arbitrate the dispute under the additional personal injury protection endorsement for an accident which occurred prior to January 1, 1982); provided that, as a condition precedent to review by a master arbitrator, the insurer shall pay all other amounts set forth in the award which will not be the subject of the appeal, as provided for in section 65-4.4 or 65-4.5 of this Subpart;
 
 
 (4) that an award rendered in an arbitration under section 65-4.4 or 65-4.5 of this Subpart, was incorrect as a matter of law (procedural or factual errors committed in the arbitration below are not encompassed within this ground);
 
 
 (5) that the attorney's fee awarded by an arbitrator below was not rendered in accordance with the limitations prescribed in section 65-4.6 of this Subpart; provided that, as a condition precedent to review by a master arbitrator, the insurer shall pay all other amounts set forth in the award which will not be the subject of the appeal, as provided for in section 65-4.4 or 65-4.5 of this Subpart.

Footnote 23:The Court described the legislative history of Insurance Law § 5106 (c) (master arbitration procedure) as "sparse," (239 AD3d at 8), which is what this Court found when researching § 5106 (b).

Footnote 24:The Court does not address the argument that ENS Medical, P.C. did not invoke CPLR Article 78 in this special proceeding in connection with that branch of the petition seeking relief against the Superintendent. That argument exalts form over substance. The relief sought is denied on the merits.